CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

MAR 0 1 2017

JULIA C. DUDLEY, CLERK
BY: _____
DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ROANOKE DIVISION

| | | |
|---|---|---|
| BRANDON JAMES CLARK, | ) | CASE NO. 7:14CV00042 |
| Petitioner, | ) | |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| HAROLD W. CLARKE, | ) | By: Hon. Michael F. Urbanski |
| Respondent. | ) | United States District Judge |

Brandon James Clark, a Virginia inmate proceeding pro se, filed this petition for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254, challenging the validity of his confinement on a judgment by the Circuit Court of the City of Waynesboro. Respondent filed a motion to dismiss Clark's § 2254 petition, and Clark responded, making the matter ripe for disposition. After review of the record, the court concludes that Clark's claim has no merit, requiring the motion to dismiss to be granted.

## I.    Background

Clark was convicted of one count of burglary with a weapon, two counts of aggravated malicious wounding, two counts of use of a firearm while committing a felony, and one count of street gang participation involving a juvenile. After Clark's direct appeal and state habeas petition were unsuccessful, he filed the present federal habeas petition pursuant to 28 U.S.C. § 2241. The district court initially denied relief because Clark had failed to exhaust state remedies, and the court also denied Clark's motion for reconsideration. However, the Fourth Circuit Court of Appeals remanded for further proceedings. The facts and procedural history pertinent to Clark's habeas claim are as follows.

On the night of November 25, 2006, Clark went to April Turner's apartment at 216 South Winchester Avenue, in Waynesboro. Five people were inside the apartment: Turner, Turner's five-year-old daughter, a juvenile named J.P., fourteen-year-old K.W., and eighteen-year-old James Gordon O'Brien (also known as "O.B." or "Crab," the slang term for a Crips gang member). Clark and fellow Bloods gang members S.W., Rashame Washington, and Jordan Strickland approached the apartment with red bandanas covering their faces.[1] S.W. knocked on Turner's door, but Turner refused to let them in, stating, "Do not come in. Don't bring this to my house." H'rg Tr. vol. 2, 5.

S.W. pushed Turner backwards and S.W., Washington, Strickland, and Clark broke into the apartment. S.W. stood over Turner while Washington, Strickland, and Clark proceeded to a bedroom where they shot K.W. once in the leg, and also shot O'Brien four or five times. The bullet that struck K.W. lodged in her thigh and she had a significant scar. O'Brien lost internal organs and had spinal cord damage, with a bullet remaining lodged next to his spine. He also had a colostomy and an ileostomy.

Clark fled the scene, and was later arrested in Newport News on December 1, 2006. Upon arrest, police found a .32-caliber handgun in Clark's possession, and the bullets in that handgun matched a shell found in Turner's parking lot. Clark confessed that he shot at O'Brien, and stated that he wished O'Brien had died.

---

[1] The four codefendants were members of the Nine Trey G ("Nine Techs and Grenades") subset of the Bloods gang, and each had a motive for the attack: (1) Washington was upset with his soon-to-be stepsister, K.W., for dating J.P., who was affiliated with the Crips, (2) Strickland "had a beef" with O'Brien because O'Brien was supposed to give Strickland a pistol, but had not, (3) and all of the codefendants were angry with O'Brien after discovering anti-Bloods graffiti ("Blood Killer") on a mailbox outside the apartment.

2

On May 2, 2007, Clark entered an _Alford_ guilty plea[2] in the Circuit Court of the City of Waynesboro, and was convicted of burglary with a weapon, two counts of aggravated malicious wounding, two counts of use of a firearm in commission of a felony, and street gang participation involving a juvenile.

At his sentencing hearing, Clark testified that he had remained outside during the shooting, and as S.W., Washington, and Strickland ran from the scene, one of them had given him the 32-caliber weapon. He heard gunshots from the parking lot, but did not know who had fired them. Also, Clark claimed that he had fired the shell found at the scene a day prior to the shootings. Clark claimed that his earlier confessions were lies to protect the younger participants. The judge sentenced Clark to an active term of forty-three years in prison.[3]

Clark's codefendants, Washington and Strickland, pleaded guilty and were convicted of the same six offenses as Clark. Washington and Strickland did not enter _Alford_ pleas.

Clark pursued direct appeals, arguing that the trial court erred in not further reducing his sentence due to mitigation evidence produced at sentencing. Clark claimed that the mitigation evidence demonstrated that he was actually innocent or only minimally involved in the crimes. The Court of Appeals of Virginia affirmed his conviction, holding that "there is substantial evidence against the defendant in this matter . . . sufficient for a finding of guilt on all six charges," and that the sentence imposed was within the range prescribed by law.

---

[2] _North Carolina v. Alford_, 400 U.S. 25 (1970) (recognizing that defendant may plead guilty while maintaining innocence).

[3] Clark's indictment carried a potential maximum sentence of three lifetimes plus eighteen years. The Commonwealth argued for an active sentence of forty-eight years; Clark's attorney argued that the court should only impose the minimum mandatory sentences. The sentencing guidelines recommended a range between ten years and five months to twenty-three years and two months, with a midpoint of nineteen years and four months.

<u>Clark v. Commonwealth</u>, 2008 Va. App. LEXIS 234, 2008 WL 2019561, at *1 n.4 (May 13, 2008). The Supreme Court of Virginia refused review. Clark timely filed a petition for a writ of habeas corpus in the Circuit Court of the City of Waynesboro, raising five claims.[4] On Oct 7, 2009, the circuit court denied habeas relief, and Clark did not pursue a habeas appeal to the Supreme Court of Virginia.

On January 31, 2014, Clark filed a petition for a writ of habeas corpus in federal district court. His § 2254 petition asserts a single Sixth Amendment claim: Trial counsel rendered ineffective assistance by advising and allowing Clark to enter into an <u>Alford</u> guilty plea when counsel did not believe Clark was guilty of the crimes he was advising him to plead guilty to, and which Clark did not commit. In support of his petition, Clark submits a 2011 unexecuted affidavit and several letters from one of the victims, O'Brien, a letter from a prisoner named "Yella Boy," and also a 2013 affidavit from codefendant Washington. The materials state that Clark did not shoot O'Brien, and that Clark was outside in the street when the shooting occurred.

Clark has not raised this claim in any Virginia court; thus, his claim is procedurally barred by <u>Coleman v. Thompson</u>, 501 U.S. 722 (1991). Also, his claim is time-barred under Va. Code § 8.01-654(A)(2) and 28 U.S.C. § 2244(d). Clark argues that under <u>Schlup v. Delo</u>, 513 U.S. 298 (1995), and <u>McQuiggin v. Perkins</u>, 133 S. Ct. 1924 (2013), his actual innocence of the crimes excuses the procedural default and time-bar under any statute of limitations. The district court initially dismissed Clark's federal habeas petition for failure to exhaust state

---

[4] Clark's five state habeas claims were as follows: (a) Clark was denied his right to a preliminary hearing; (b) Clark's plea was involuntary as it was coerced and made under duress; (c) Clark's multiple convictions violated his right to be free from double jeopardy; (d) counsel was ineffective at trial and on appeal; and (e) the evidence was insufficient to support the convictions.

4

remedies. Clark v. Clarke, No. 7:14-cv-00042 (W.D. Va. Feb. 10, 2014) (ECF No. 3). Clark sought reconsideration of the dismissal, which was denied. Clark v. Clarke, No. 7:14-cv-00042 (W.D. Va. Apr. 10, 2014) (ECF No. 7).

Clark appealed to the Fourth Circuit Court of Appeals, and the Court of Appeals reversed the dismissal and remanded to the district court, directing the court to treat Clark's claim as exhausted and defaulted under Sparrow v. Director, Dep't of Corrections, 439 F. Supp. 2d 584 (E.D. Va. 2006). The Court of Appeals held that the district court should have determined (1) whether Clark's actual innocence claim excuses the procedural default and untimeliness of his § 2254 petition, and (2) if Clark's actual innocence does excuse his doubly defaulted petition, whether the underlying ineffective assistance of counsel claim has merit. Clark v. Clarke, No. 14-6615 (4th Cir. May 11, 2016) (ECF No. 13).

## II.    Actual Innocence

### A. Standard of Review

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) severely restricts federal habeas relief afforded to state prisoners. "Generally, a federal court may not consider claims that a petitioner failed to raise at the time and in the manner required under state law." Teleguz v. Zook, 806 F.3d 803, 807 (4th Cir. 2015) (citation omitted). "[An] exception is made for cases in which a compelling showing of actual innocence enables a federal court to consider the merits of a petitioner's otherwise defaulted claims." Id. For a petitioner to claim actual innocence, "[new] evidence must establish sufficient doubt about [a petitioner's] guilt to justify the conclusion that his [incarceration] would be a miscarriage of justice *unless* his conviction was the product of a fair trial." Schlup, 513 U.S. at 316

5

(emphasis in original). Actual innocence "does not by itself provide a basis for relief. Instead, [the petitioner's] claim for relief depends critically on the validity of his [procedurally defaulted claim]." Schlup, 513 U.S. at 315 (citing Herrera v. Collins, 506 U.S. 390, 403 (1993)).

"[H]abeas corpus petitions that advance a substantial claim of actual innocence are extremely rare." Id. at 322. To state such a claim, the petitioner must satisfy a "rigorous" burden by "support[ing] his allegations of constitutional error with new reliable evidence— whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." Id. at 324. Further, "[h]aving been convicted . . . [petitioner] no longer has the benefit of the presumption of innocence. To the contrary, [petitioner] comes before the habeas court with a strong—and in the vast majority of the cases conclusive—presumption of guilt." Id. at 326 n.42.

The district court must examine all evidence and make a holistic threshold determination about the petitioner's claim of innocence separate from its inquiry into the fairness of his trial. Teleguz v. Pearson, 689 F.3d 322, 330 (4th Cir. 2012). The district court may consider: the nature of evidence, House v. Bell, 547 U.S. 518, 537 (2006), the timing of submissions, McQuiggin, 133 S. Ct. at 1928, the credibility of witnesses, House, 547 U.S. at 537, 552, and the probative force of the newly supplemented record. House, 547 U.S. at 538; Sharpe v. Bell, 593 F.3d 372, 381 (4th Cir. 2010). After performing this analysis, the district court must determine whether "it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." Schlup, 513 U.S. at 328.

6

In addition, the reviewing court has significant latitude to make credibility assessments in actual innocence cases. See, e.g., United States v. Connolly, 504 F.3d 206, 213-14 (1st Cir. 2007) (The appellant "place[d] most of his emphasis upon [a co-felon's] jailhouse recantation . . . however, [the co-felon's] testimony did not occur in a vacuum . . . much of his testimony received substantial circumstantial corroboration."); United States v. Gonzalez-Gonzalez, 258 F.3d 16, 22 (1st Cir. 2001) (holding evidence of perjury is weak when it depended on the credibility of two convicted felons); see also McCray v. Vasbinder, 499 F.3d 568, 574 (6th Cir. 2007) (A witness identified the appellant as the murderer at trial, but stated that he could not identify the perpetrator at a later evidentiary hearing. "Reasonable jurors no doubt could question the credibility of this about face from another inmate and rationally could discount his testimony as nothing more than an attempt to keep from being 'pegged as a rat.'"). A district court may have greater difficulty determining the credibility of evidence on a "cold record," but the Fourth Circuit Court of Appeals has allowed the district court to conclude that the evidence is inadequate or unreliable enough to dismiss the petition without an evidentiary hearing. See Teleguz, 689 F.3d at 331.

### B. Guilty Pleas

Pleading guilty does not entirely preclude a petitioner from claiming actual innocence at habeas proceedings; however, guilty pleas and partial confessions "seriously undermine" the claim. See Chestang v. Siso, 522 Fed. App'x 389, 390 (9th Cir. 2013) (holding that "the evidence . . . was overwhelming" based on the petitioner's confession and guilty plea); Buie v. McAdory, 341 F.3d 623, 626 (7th Cir. 2003) ("[I]t is hard to see how one who has confessed can assert actual innocence."). In United States v. Broce, the Supreme Court of

the United States held that by pleading guilty, "the accused is not simply stating that [the accused] did the discrete acts described in the indictment; [the accused] is admitting guilt of a substantive crime." 488 U.S. 563, 570 (1989). The Fourth Circuit Court of Appeals has even instructed district courts to generally dismiss petitions that contradict the plea colloquy. See States v. Lemaster, 403 F.3d 216, 221-22 (4th Cir. 2005) ("[I]n the absence of extraordinary circumstances, the truth of sworn statements made during a Rule 11 colloquy is conclusively established, and a district court should, without holding an evidentiary hearing, dismiss any § 2255 motion that necessarily relies on allegations that contradict the sworn statements.").

Additionally, guilty pleas give rise to several issues under Schlup: there is no factfinder (judge or jury) finding, the record is normally abbreviated, the state did not "present" evidence in the typical fashion to establish guilt beyond a reasonable doubt, and the petitioner has confirmed his guilt in a plea colloquy. See Bousley v. United States, 523 U.S. 614, 631-32 (1998) (Scalia, J., dissenting) ("[H]ow is the court to determine 'actual innocence' upon our remand . . . where conviction was based upon an admission of guilt?" Justice Scalia continued: "Presumably the defendant will introduce evidence [that he did not commit the crime] . . . and the Government . . . will have to find and produce witnesses saying that he did [commit the crime]. This seems to me not to remedy a miscarriage of justice, but to produce one."); Smith v. Baldwin, 510 F.3d 1127, 1140 n.9 (9th Cir. 2007) ("We are aware of a potential incongruity between the purpose of the actual innocence gateway announced in Schlup and its application to cases involving guilty (or no contest) pleas."); Ruiz v. Gonzalez, 2009 WL 3233558, 2009 U.S. Dist. LEXIS 96668, at *8 n.5 (C.D.

8

Cal. Oct. 2, 2009) (holding that the habeas court "must consider petitioner's guilty plea in determining whether petitioner can meet the Schlup standard").

## C. Schlup Gateway

Importantly, the seminal "actual innocence" cases relied on compelling evidence of actual innocence. See Bousley, 523 U.S. at 623 (holding that "'actual innocence' means factual innocence, not mere legal insufficiency."). In Schlup, a prison surveillance video showed the petitioner in the dining hall sixty-five seconds before guards responded to the murder he was charged with. The petitioner included affidavits that (1) professed Schlup's innocence, (2) identified another inmate as the assailant, (3) stated that the petitioner could not have traveled from the dining hall to the murder scene in the known elapsed time, and (4) revealed that the petitioner had been unhurried, certainly not as if he was rushing away from a murder scene. Schlup, 513 U.S. at 335-40. In House, the petitioner presented testimony that the victim's husband had admitted to several people that he had murdered his wife, and also called into question the prosecution's central forensic proof. 547 U.S. at 554 (The Court held that "the issue [was] close.").

In proving actual innocence, "recanting affidavits are always viewed with 'extreme suspicion.'" Williams v. Coyle, 260 F.3d 684, 708 (6th Cir. 2001) (quoting United States v. Chamber, 944 F.2d 1253, 1264 (6th Cir. 1991) (superseded in part on other grounds by U.S.S.G. § 2D1.5(a))). Generally, "[W]here a motion for a new trial is based upon recantation of testimony given at the trial, such testimony is 'looked upon with the utmost suspicion,'" United States v. Johnson, 487 F.2d 1278, 1279 (4th Cir. 1973) (quoting United States v. Lewis, 338 F.2d 137, 139 (6th Cir. 1964)), a skepticism that only increases as time

9

passes. <u>See</u> <u>Komolafe v. Quarterman</u>, 246 Fed. App'x 270, 272 (5th Cir. 2007) (holding that the credibility of a recantation affidavit was mitigated when it was not submitted until eight years after a conviction), <u>cert. denied</u>, 552 U.S. 1168 (2009)). Further, courts "have little confidence in [a codefendant's] postsentencing truth experience because he had nothing whatsoever to lose by incriminating himself after receiving a 60-year sentence." <u>Drew v. Scott</u>, 28 F.3d 460, 463 (5th Cir. 1994) (citing <u>Drew v. State</u>, 743 S.W.2d 207, 228 (Tex. Crim. App. 1987)).

## III. Evidence

### A. Inculpatory Evidence

Clark's plea colloquy and his statements to police and at sentencing are significant evidence of his guilt. During his plea colloquy, Clark testified that he and his attorney had discussed the charges, the elements of the charges, and what the Commonwealth was required to prove before he could be found guilty. He stated that he had had adequate time to meet and confer with his attorney regarding the case and any defenses he had to the charges. Following the Commonwealth's presentation of a summary of the evidence, Clark stated that he had freely and voluntarily decided to plead guilty, because he did not want to risk a longer jail sentence from being found guilty at trial. He also told the court that he understood that by pleading guilty, he was waiving several of his rights, including his right to a trial by jury and his right to present evidence and confront his accusers. He testified that no one had coerced him into pleading guilty, and that he was satisfied with the services of his attorney.

10

At sentencing, the Commonwealth tendered "a substantial proffer of the evidence . . . in support of the guilty plea" by presenting evidence that Clark confessed to: (1) firing his .32-caliber pistol and burning one of O'Brien's blue bandanas (Crips gang colors) in front of Turner's apartment the day before the shooting in retaliation for rival Crips leader O'Brien writing "Blood Killer" in graffiti in Turner's apartment parking lot, (2) giving Washington a gun, (3) shooting at K.W. and O'Brien with a .32-caliber weapon, (4) firing the pistol once at O'Brien before his gun jammed, (5) fleeing the apartment before he was able to fix his jammed weapon, (6) wishing that O'Brien had died because Clark was going to serve time anyway for the shootings, and (7) stating that K.W. did not deserve to be shot. See Clark v. Commonwealth, 2008 WL 2019561, 2008 Va. App. LEXIS 234, at *1 n.4; Hr'g Tr. vol. 2, 4-20, 80-82. Further, the Commonwealth introduced evidence that police had discovered a shell casing at the crime scene parking lot that matched shells contained in a .32-caliber weapon found on Clark when he was arrested in Newport News on December 1, 2006.

The Commonwealth acknowledged that Clark's statements to police about his own involvement were inconsistent, but extremely inculpatory. Regarding the .32-caliber pistol that police recovered on Clark during his arrest, Clark initially informed Newport News Officer Snyder that he stole the weapon from his uncle, but then later said that he bought it off the streets of Charlottesville. Clark told a completely different story to Waynesboro Officer Luzader, stating that Washington had yelled that O'Brien was reaching for a gun while Clark and Strickland were still outside the apartment. Upon hearing Washington shout, Clark said that he ran into the apartment and grabbed the gun from a drawer that O'Brien was reaching into, and shot at O'Brien with the pistol. The gun jammed, and Clark

11

left the apartment. While exiting the front door, he attempted to fire another shot over his head back into the apartment, but the pistol jammed again or remained jammed.

In an interview just a few hours later, Clark told officers that all four codefendants entered the apartment because they could hear O'Brien inside, with Clark stating as they entered, "Well, if he won't come out to us, we will go in." Hr'g Tr. vol. 2, 15. Clark also told police that Strickland shot O'Brien five times, and that Strickland received the .45-caliber pistol from Washington, who was given the gun by Clark. During questioning, Clark informed officers that he had given Washington the gun to hold because Clark "was going [to the apartment] to fistfight O.B." Id. at 14.

Further, the Commonwealth outlined statements from K.W., J.P, and S.W. at the sentencing hearing. K.W. told police that Washington shot her, and that "three individuals came in [to the bedroom]," while S.W. stood over Turner. Id. at 6. J.P. told officers that "Clark had a [] very big hairstyle, that was a unique hairstyle," and although J.P. did not know Clark, he was able to identify him by the hairstyle as one of the three men wearing red bandanas that broke into Turner's apartment. Id. S.W. stated that Clark and Strickland shot O'Brien and K.W. Id.

Lastly, Clark fully admitted his involvement and membership in the Bloods. After his arrest, Clark made gang signs while being photographed during processing and refused an officer's offer of Burger King during questioning because the initials of the restaurant, "BK," also stood for "Blood Killer." At his sentencing, Clark told the court that his tattoo "MOB" meant "Member of Bloods," and his final statement was: "One thing about Blood, you look forward to the devil. He's supposed to be your father." Id. at 128, 146.

12

## B. Exculpatory Evidence

At sentencing, Clark claimed that he was actually innocent of the charges, and was pleading guilty in fear of convictions at trial that would lead to significantly longer prison sentences. Clark testified that he arrived at Turner's apartment to fistfight O'Brien, but that he never entered the apartment. Instead, he stayed behind in the parking lot while his codefendants went upstairs and shot O'Brien and K.W. Clark claimed that he had given Washington his .32-caliber pistol to hold during Clark's planned fistfight with O'Brien, and after the shooting, someone gave him back the gun as all the gang members fled.

Moreover, counsel demonstrated that the shell casing that matched the shells in the weapon recovered by Newport News police during Clark's arrest came from the parking lot, not Turner's apartment. Clark explained that he had fired that bullet prior to the night of the shooting, to retaliate against the Crips member that had authored anti-Bloods graffiti in Turner's parking lot.

Additionally, counsel highlighted some inconsistencies amongst the eyewitnesses' testimony regarding Clark's presence in the apartment during the shooting. April Turner only identified Washington, S.W., and Strickland as perpetrators of the shooting, J.P.'s written statement only refers to Washington and S.W., and in K.W.'s statements to police, she never stated that she saw Clark inside the apartment. Id. at 57-60. At one point, K.W. even told police that she was one-hundred percent sure that her brother, Washington, had shot her, even though S.W. had implicated Strickland and Clark as the shooters. Id. at 59.

## C. Clark's New Evidence

13

Clark offers two categories of new evidence in support of his actual innocence claim: (1) affidavits from codefendant Washington and victim O'Brien stating that Clark is innocent; and (2) letters from victim O'Brien and "Yella Boy" that exculpate Clark from the shooting of O'Brien.

In Washington's November 15, 2013 affidavit, he stated that he had personal knowledge of the shooting of O'Brien and K.W., and that Clark was outside in the street when the shooting happened, and was uninvolved when the shooting occurred. Washington also maintained his innocence. O'Brien, in an unexecuted October 17, 2011 affidavit, stated that Clark did not commit the crimes, and should be released.

Clark also submitted four letters from O'Brien.[5] In the first letter, O'Brien claimed that he had not written the Commonwealth,[6] and that he never implicated Clark in the shooting, and that he knew Clark did not shoot him. See Letter No. 1 from James O'Brien to Brandon Clark, 10-11 (ECF No. 1, Attach. 1). In his second letter, O'Brien informed Clark that he would help Clark because they had no "beef," but that O'Brien wanted to "bang on Jorden [Strickland] [sic]." Letter No. 2 from James O'Brien to Brandon Clark, 9 (ECF No. 1, Attach. 1). In O'Brien's third letter, O'Brien apologized for the affidavit taking so long because he was trying to get it notarized. See Letter No. 3 from James O'Brien to Brandon Clark (Oct. 23, 2011), 4 (ECF No. 1, Attach. 1). In O'Brien's fourth letter, O'Brien

---

[5] One letter was dated October 23, 2011, another was November 16, 2011, and the other two letters were undated.

[6] O'Brien was referencing the Order on Mot. to Modify Sentence, Commonwealth v. Clark, No. CR08000107-112, at 1 (Va. Cir. Ct. Oct. 3, 2007), that stated that O'Brien had written the Commonwealth, informing the prosecutor: "1) that [O'Brien] was being coerced and threatened by Mr. Clark while both men were incarcerated at Middle River Regional Jail; 2) that Mr. Clark was still affiliated with certain gangs; and 3) that the contents of the letters submitted to the Court by Mr. Clark were false."

14

stated that he knew that Clark had not shot him, but that Strickland had been the shooter, and O'Brien would testify to that fact. See Letter No. 4 from James O'Brien to Brandon Clark (Nov. 16, 2011), 5-6 (ECF No. 1, Attach. 1). O'Brien acknowledged that there were no hard feelings between O'Brien and Clark. Id. at 6.

Yella Boy's undated letter discussed a conversation that Yella Boy and O'Brien had had about Clark. Yella Boy wrote: "[O'Brien] said he knows [that Clark did not shoot him] cause [O'Brien and Clark had] talked and were supposed to fight . . . when that shit went down [Clark] had a like what the fuck look on [his] face and just ran." Letter from Yella Boy to Brandon Clark, 7-8 (ECF No. 1, Attach. 1).

## IV.    Analysis

Here, the evidence offered by Clark does not rise to the level required by Schlup. Clark has not submitted compelling evidence to raise sufficient doubt about his guilt and undermine confidence in his convictions.

First, Clark's submitted affidavits lack credibility and do not offer a compelling claim of actual innocence. Both O'Brien and Washington are felons and former gang members. Further, O'Brien was Clark's childhood friend before they became gang rivals, and Washington is a codefendant that claimed to maintain his innocence, directly contradicting Washington's plea colloquy with his affidavit. The affidavits are also incredibly short, lack any specific details that would bolster their believability, and were written several years after the shootings. Tellingly, Clark does not offer affidavits from any of the other victims or eyewitnesses.

Second, the letters do not offer any new compelling evidence of Clark's innocence; instead, the letters merely reiterate his general "fistfight" theory: that he was not present in the apartment during the shooting because he was waiting for O'Brien in the parking lot. Moreover, Yella Boy did not even have personal knowledge of the shootings; he sent a letter to Clark paraphrasing O'Brien's statement about Clark's lack of involvement. Also, the context of Yella Boy's statement about Clark's supposed reaction is problematic: "When that shit went down you had a like what the fuck look on your face and just ran." Id. at 8. O'Brien could not have told Yella Boy about Clark's reaction considering O'Brien was in the process of being shot and Clark was apparently in the parking lot. Clark has not claimed that Yella Boy had information from other witnesses or participants of the shootings, or that he was present at the scene to gauge Clark's reaction. Clearly, Yella Boy's comments are missing some contextual link, because Yella Boy would not know what Clark's face looked like, unless, of course, Clark was telling Yella Boy what to say in the letter.

Third, even with some inconsistency in the Commonwealth's evidence, Clark's explanation of his actions on the night of November 25, 2006 does not make sense. He claims to have been in the parking lot in order to fistfight O'Brien, but the court cannot comprehend how Clark could honestly believe that a fistfight was going to occur as his party approached the apartment of known Crips-affiliates armed with at least two handguns and with red bandanas covering their faces. The court finds it inherently unbelievable that avowed enemy gang members who had several recent violent confrontations[7] would put

---

[7] Besides Clark shooting in the apartment parking lot and burning O'Brien's blue bandana, several heated gang-related incidents had recently occurred involving Clark, his codefendants, and the victims. O'Brien had told Clark during a phone call that "he don't know [Clark]; he never knew [Clark] and . . . And when he do see [Clark], he's going to shoot [Clark] in [his] face on sight," Strickland told Clark that he had fought O'Brien prior to the

16

aside their weapons and merely observe as Clark and O'Brien engaged in a fistfight. The court also finds Clark's statement that he had no idea about the true intentions of Washington, Strickland, and S.W. as they forced their way into Turner's apartment to be extremely unlikely, especially considering Washington's upset demeanor and prior confrontation of K.W., as well as Strickland and S.W.'s prior statements regarding O'Brien.

Fourth, Clark's explanation for his multiple inconsistent statements and blatant fabrications is unbelievable. Clark claims that he confessed to police in order to protect the younger participants, specifically to cover for Washington. Hr'g Tr. vol. 2, 118. However, in Clark's confessions, he explicitly implicates all of his codefendants in both the shootings and the burglary as either principals or in the second-degree. Clark also singled Washington out in stating that Clark had given Washington a handgun before the shootings. His "reasoning" for lying to authorities defies logic; however, Clark's abandonment of his confession in order to claim innocence and avoid a lengthy jail sentence was much more rational, albeit dishonest.

Fifth, under a <u>Schlup</u> analysis, the factfinder would still have to determine whether to believe Clark's "fistfight" version of events bolstered by affidavits and letters authored by felons, or follow his initial confession that he shot O'Brien and wished that he had died, the eyewitness accounts of Clark in the apartment, the strong circumstantial evidence of getting arrested while in possession of one of the weapons used in the shooting, as well as Clark's acknowledgement of his guilt in his plea colloquy. The court finds that Clark's claim is

---

November 25 shootings, Washington had had an altercation with his soon-to-be-stepsister K.W., who was dating Crips-affiliated juvenile J.P., and S.W. had called the men "a bunch of scared niggers" for not retaliating against O'Brien. Hr'g Tr. vol. 2, 85-90, 99-102.

neither credible nor compelling, and even with some uncertainty as to the precise identities of the shooters, legal insufficiency is not enough to prove actual innocence under Schlup.

In summary, the court finds that Clark has not shown that he is actually innocent of the burglary of Turner's apartment or the shootings of O'Brien and K.W. Based upon a consideration of all of the new evidence combined with prior inculpatory and exculpatory evidence, the court finds that it is not likely that any reasonable juror would have had a reasonable doubt as to Clark's guilt.

## V. Ineffective Assistance Claim

Regardless of whether Clark's evidence meets the demanding Schlup standard, his underlying Sixth Amendment ineffective assistance of counsel claim fails the strict Strickland v. Washington test. To state a constitutional claim for ineffective assistance, Clark must satisfy the two-prong Strickland test by showing (1) "that counsel's performance was deficient," and (2) "that the deficient performance prejudiced the defense." 466 U.S. 668, 686-687 (1984). A petitioner must overcome "a strong presumption" that counsel's tactical decisions during the representation were reasonably competent, and the court may adjudge counsel's performance deficient only when a petitioner demonstrates that "in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." Id. at 689-90.[8]

Clark's § 2254 petition asserts a single claim: "[T]rial counsel rendered ineffective assistance by advising and permitting Clark to enter the Alford pleas even though the lawyer believed, based on a mass of exculpatory evidence, that Clark was not guilty of the offenses

---

[8] "The Sixth Amendment guarantees reasonable competence, not perfect advocacy judged with the benefit of hindsight." Yarborough v. Gentry, 540 U.S. 1, 8 (2003).

18

charged." Pet'r's Br. 16, <u>Clark v. Clarke</u>, No. 7:14CV00042 (ECF No. 1). Although Clark never raised this precise issue in earlier proceedings, claim d of his state habeas proceeding stated a similar claim: Clark alleged that had counsel informed him of the lack of evidence in the Commonwealth's possession, he would have insisted on going to trial, and the evidence counsel presented on his behalf at sentencing could have been used to defend his case.

As detailed in his plea colloquy, Clark was concerned that his gang activity would not "play well" with a jury. Clark's counsel warned that if the jury rejected Clark's testimony, Clark would face a significantly higher sentence. Counsel advised Clark that entering an <u>Alford</u> guilty plea and then convincing a judge of Clark's innocence and minimal involvement was the best strategy, because the judge could consider the sentencing guidelines when juries do not. Clark decided to pursue an <u>Alford</u> plea in spite of the Commonwealth's overwhelming evidence; Clark knew of the potential for a sentence above the guidelines. Lastly, Clark could have withdrawn his guilty plea prior to sentencing, and counsel stated in an affidavit that counsel was prepared to take the case to trial if Clark wished, but Clark declined to do so.

The state habeas court found that Clark's petition failed to satisfy either prong of the <u>Strickland</u> test because he "failed to state a valid reason why he should not be bound by his statements at trial concerning his knowledge of the Commonwealth's evidence and the adequacy of his counsel." <u>Clark v. Johnson</u>, No. CL09000358-00, at 9-10 (Va. Cir. Ct. Oct. 7, 2009). The Circuit Court of the City of Waynesboro continued: "the evidence against Clark was overwhelming and he fails to demonstrate that a reasonable defendant would have

19

insisted on pleading not guilty, gone to trial and the outcome of the case would have been different . . . ." Id. at 10. The state habeas court further explained Clark's failure under Strickland:

> In light of [Clark's] statement to police, the nature of the offenses, a gang-related home invasion and shooting, the injuries sustained by the victims, the presence of a young child . . . in the home, [Clark] simply cannot demonstrate that a reasonable defendant would have pleaded not guilty, insisted on going to trial and the outcome of the proceeding would have been different or the sentence would have been less.

Id. at 10-11. Additionally, on direct appeal, the Court of Appeals of Virginia held: "[A]lthough Clark introduced evidence at sentencing to deny or minimize his involvement in the crimes, the Commonwealth offered a substantial proffer of the evidence, including Clark's confession, in support of the guilty plea[s]." Clark v. Commonwealth, 2008 WL 2019561, 2008 Va. App. LEXIS 234, at *1 n.4. The appellate court continued: the Commonwealth's "substantial evidence . . . [was] sufficient for a finding of guilt on all six charges." Id.

The court agrees with the state courts' findings. Clark has not overcome the deference given to the fact-finding of the state courts under the AEDPA and Strickland with (1) affidavits from convicted felons, (2) letters from convicted felons, and (3) other evidence that generally corroborates some of Clark's statements, but directly contradicts Clark's confession, plea colloquy, and the Commonwealth's "overwhelming" evidence. These findings are not an unreasonable application of federal law or an unreasonable determination of facts. Therefore, the court grants the motion to dismiss.

## VI.

For the reasons stated, the court **GRANTS** the motion to dismiss. Clark has failed to present sufficiently reliable evidence to state a substantial claim of actual innocence that would excuse his procedural default and time-bar under Schlup and McQuiggin. Moreover, Clark's underlying ineffective assistance of counsel claim is without merit. An appropriate order will enter this day.

The Clerk is directed to send copies of this memorandum opinion and accompanying order to Terry and to counsel of record for Respondent. Further, finding that petitioner has failed to make a substantial showing of the denial of a constitutional right as required by 28 U.S.C. § 2253(c)(1), a certificate of appealability is **DENIED**.

**ENTER:** This 28th day of February, 2017.

/s/ Michael F. Urbanski
_____
United States District Judge

21